FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

SEP 10 2010

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

WYOMING STATE SNOWMOBILE
ASSOCIATION and the
WASHINGTON STATE
SNOWMOBILE ASSOCIATION,

     Petitioners,

     vs.

U.S. FISH AND WILDLIFE SERVICE
and KENNETH SALAZAR,
SECRETARY OF THE INTERIOR,

     Respondents,

and

DEFENDERS OF WILDLIFE, CENTER
FOR BIOLOGICAL DIVERSITY,
CONSERVATION NORTHWEST,
FRIENDS OF THE WILD SWAN,
JACKSON HOLE CONSERVATION
ALLIANCE, and LANDS COUNCIL,

     Intervenor-Respondents.

Case No. 09-cv-00095-F

## OPINION AND ORDER

This matter is before the Court upon Petitioners' Complaint against Respondents, the

U.S. Fish and Wildlife Service and Kenneth Salazar, Secretary of the Interior (the Service).

On September 15, 2009, Defenders of Wildlife, Center for Biological Diversity,

Conservation Northwest, Friends of the Wild Swan, Jackson Hole Conservation Alliance,

and Lands Council (Intervenors) were allowed to intervene in support of the Service.[1]  After

considering the administrative record, reading the briefs of the parties, reviewing the

materials on file, having heard oral argument, and being fully advised in the premises, the

Court **FINDS** and **ORDERS** as follows:

## I. Introduction

On February 25, 2009, the Service designated revised critical habitat for the

contiguous United States distinct population segment of the Canada lynx (lynx) under the

Endangered Species Act of 1973, as amended (ESA). 74 Fed.Reg. 8616, codified at 50 CFR

Part 17 (2009 CHD Rule). Approximately 1,836 square miles of land in the Northern

Cascades (north-central Washington), 9,500 square miles in the Greater Yellowstone Area

(southwestern Montana and northwestern Wyoming), and 27,664 square miles of land in

three other areas fall within the boundaries of the revised designation (totaling approximately

_____

[1]When discussing arguments, the phrase "the Service" also refers to Intervenors
Defenders of Wildlife, Center for Biological Diversity, Conservation Northwest, Friends
of the Wild Swan, Jackson Hole Conservation Alliance, and Lands Council.

39,000 square miles of land). Petitioners, the Wyoming and Washington State Snowmobile Associations (the Associations) argue the designation violates the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331, *et seq*., the ESA, 16 U.S.C. § 1533(a)(3)(A) and (B), and the Administrative Procedure Act (APA), 5 U.S.C. § 706. The Associations challenge the designation in four ways. First, the Associations argue the Service violated NEPA by relying on an inadequate Environmental Assessment to issue a *pro forma* Finding of No Significant Impact (FONSI), rather than issuing a thorough Environmental Impact Statement. Second, the Associations argue the critical habitat designation (CHD) violated the ESA by including lands that lacked the physical and biological features necessary for the conservation of the species as well as lands that did not require special management considerations or protection. Third, the Associations argue the Service violated the ESA by producing an inadequate economic analysis. Finally, the Washington Association argues the Service failed to make the exclusion determination under ESA Section 4(b)(2) on whether the benefits of excluding federal lands in Washington State currently managed under the Lynx Conservation Assessment Strategy (LCAS) outweighed the benefits of including these lands. The Associations request the Court declare the 2009 CHD Rule unlawful, enjoin its implementation, and remand the Rule to the Service for further consideration in compliance with NEPA and the ESA. For the reasons that follow, the Court finds the ESA challenge is

3

well taken in part.

## II. Background

The lynx are medium-sized cats comparable to a bobcat. The lynx are distinguishable from bobcats by their large, well-furred feet and long legs for traversing snow. 74 Fed.Reg. 8616. Also in contrast to the bobcat, lynx are highly specialized predators of snowshoe hare. Both the lynx and snowshoe hares are strongly associated with what is broadly described as boreal forest or cold temperate forest with extended cold, snowy winters. "In mountainous areas, the boreal forests that lynx use are characterized by scattered moist forest types with high hare densities in a matrix of other habitats (e.g., hardwoods, dry forest, non-forest) with low hare densities. In these areas, the lynx incorporate the matrix habitat (non-boreal forest habitat elements) into their home ranges and use it for traveling between patches of boreal forest that support high hare densities." *Id.* Lynx are highly mobile and generally move long distances. *Id.* at 8617. The largest presence of lynx population in the contiguous United States is in the Northern Rocky Mountains/Cascades region. 65 Fed.Reg. 16055-59.

Since March 24, 2000, the lynx has been protected by its listing as a "threatened" species under the ESA. *Id.* at 16,052; 16 U.S.C. § 1533. The ESA is the "'most comprehensive legislation for the preservation of endangered species ever enacted by any nation.'" *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687,

4

698, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)). When Congress enacted the statute in 1973, it intended to bring about the "better safeguarding, for the benefit of all citizens, [of] the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5).

The ESA listing protection extends throughout the entire range for the lynx without regard to whether the lynx inhabits any designated critical habitat or not. However, when the lynx was listed as "threatened," the Service was also required to "concurrently" designate "critical habitat" unless a determination was made that such habitat "is not then determinable." 16 U.S.C. § 1533(a)(6)(c).

Critical habitat is defined in the ESA to include those specific areas which are presently "occupied by the species . . . on which are found those physical or biological features (i) essential to the conservation of the species and (ii) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A). Critical habitat may also include habitat that is unoccupied by the species at the time of the listing, if the Service determines that such areas are "essential for the conservation of the species." *Id.* Finally, the Secretary of the Interior may exclude any area from critical habitat if the benefits of exclusion outweigh the benefits of inclusion, as long as the exclusion would not result in the extinction of the species. *Id.* § 1533(b)(2). The overarching mandate for the CHD process

5

is the mandate that the Service use the best scientific data available and take into consideration the economic impact, and any other relevant impact, of specifying any particular area as critical habitat. *Id.*

Notwithstanding the ESA mandate to "concurrently" designate "critical habitat," it took litigation for the Service to undertake rulemaking for the designation of critical habitat for the lynx. *Defenders of Wildlife v. Norton*, 239 F.Supp.2d 9 (D.D.C.2002). That rulemaking resulted in a 2006 final rule designating 1,841 square miles of critical habitat for lynx (2006 CHD Rule). 71 Fed.Reg. 66007.

The 2006 CHD Rule was not the end of the story. In July 2007, the Service announced it would review the 2006 CHD Rule after questions were raised about the integrity of scientific information used and whether the 2006 decision was consistent with the appropriate legal standards. Based on its review, the Service decided that the 2006 CHD Rule was improperly influenced by then deputy assistant secretary of the Interior Julie MacDonald and, as a result, was not supported by law or science. 74 Fed.Reg. 8617-18. That decision initiated a process which resulted in the 2009 CHD Rule designating 39,000 square miles of land as critical habitat. While the Service argues this designation consists solely of geographic areas occupied by lynx with the necessary physical and biological features essential to their conservation and which may require special management

6

considerations or protection, that decision is under challenge by the Associations on both procedural and substantive grounds.

## III. Standard of Review

This case is brought under the ESA citizen suit provision, 16 U.S.C. § 1540(g), and under the APA, 5 U.S.C. § 706(2)(A). The APA standard applies not only to claims asserting a violation of the APA, but also to those asserting NEPA and ESA violations. *Fuel Safe Washington v. FERC*, 389 F.3d 1313, 1322-23 (10th Cir. 2004); *New Mexico Cattle Ass'n v. U.S. Fish and Wildlife Service*, 248 F.3d 1277, 1281 (10th Cir. 2001).

Under the APA's deferential standard of judicial review, an agency's action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A). The court may not substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court's limited role is to ensure that the agency's decision is based on relevant factors and is not a "clear error of judgment." *Id.* "It is not [the court's] duty, however, to substitute [its] judgment for that of the agency's on matters within its expertise." *Colorado Wild, Heartwood v. FS*, 435 F.3d 1204, 1213-14 (10th Cir. 2006) (citation omitted). The deference given to an agency is especially strong where, as here, "the challenged decisions

7

involve technical or scientific matters within the agency's area of expertise." *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 739 (10th Cir. 2006)(citation omitted).

In exercising its narrowly defined review authority under the APA, a court must consider whether the agency acted within the scope of its legal authority, whether the agency adequately explained its decision, whether the agency based its decision on facts in the record, and whether the agency considered the relevant factors. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814.

The deference a court must accord an agency's decision-making is not unlimited, however. Where an agency fails to articulate "a rational connection between the facts found and the choice made,"*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, et al.,* 462 U.S. 87, 88, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983), the Court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Dithiocarbamate Task Force v. EPA,* 98 F.3d 1394, 1401 (D.C.Cir.1996) (quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).

8

## IV. Discussion

A.    Standing

The Service argues the Associations and their members lack Article III standing to

pursue their claims for relief because they have failed to demonstrate any "injury-in-fact" as

a result of the CHD, and all feared injuries exist wholly apart from the designation and are

traceable to a host of other causes.

Here, the Associations assert standing to sue on behalf of their members. "An

association has standing to bring suit on behalf of its members when its members would

otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the

participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Sevs.*, 528 U.S. 167, 181 (2000). Therefore, to establish constitutional standing, the

Associations, through their members, must meet three elements: (1) injury-in-fact, (2)

causation, and (3) redressability. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61

(1992).

In the environmental context, a plaintiff who has repeatedly visited a particular site,

has imminent plans to do so again, and whose interests are harmed by a defendant's conduct

has suffered injury in fact. *See Summers v. Earth Island Inst.,* 129 S. Ct. 1142, 1149 (2009).

9

"While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interest of the plaintiff, that will suffice." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 734-36, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).

In this case, the Associations, through their members have demonstrated standing. By their Amended Complaint and affidavits, the members state they visit, use and enjoy the particular lands in Washington and Wyoming at issue in the case for recreation, wildlife viewing, camping, fishing, and aesthetic enjoyment, and expect to do so again. Members have identified and discussed real and immediate financial impacts resulting from the 2009 CHD Rule in that they operate businesses that provide access to winter recreational activities or that depend on snowmobile recreation for their livelihood. In addition, by specific affidavits, the Associations' members discuss how the conservation efforts for the lynx have raised fears among snowmobilers that popular areas designated as critical habitat by the 2009 CHD rule will be closed to snowmobile travel for the protection of the lynx, which has and will continue to have a significant negative impact on their rural communities and businesses by drastically reducing recreational spending including the investment in expensive snow machines and accessories.

The members also discuss well-founded and particularized fears that the Service's

10

administration of the 2009 CHD rule will result in additional adverse impacts to their recreational and aesthetic interests, along with new restrictions and heightened regulatory burdens that will adversely impact their business and personal interests above and beyond those restrictions and burdens caused by the listing of the lynx as "threatened" and by existing land management requirements of the current Lynx Conservation Assessment Strategy (LCAS). They state that the CHD and corresponding increased regulatory burden will restrict their access to and safe use of the designated lands by making it more difficult and in some cases impossible to obtain federal approvals to maintain and improve existing snowmobile trails and facilities, especially in burned-out areas, and by limiting their ability to create new over-the-snow quality trails, resulting in poorly maintained, unsafe and more congested trails. They further state that the CHD will restrict and in some cases prohibit implementation of important forest management and forest ecology practices necessary to prevent fires, disease and insect infestation and to promote a critical balance between forest health and habitat.

Contrary to the Service's argument, these real and immediate impacts and particularized fears of future impacts do not appear to be speculative, conjectural or hypothetical. *C.f.*, *Stewart v. Kempthorne*, 55 F.3d 1245, 1254 (10th Cir. 2009). The affidavits also discuss the procedural injury they have suffered if the CHD should have

11

proceeded under an EIS rather than an EA with a finding of no significant impact. These discussions of the members' procedural injury distinguish this case from *Summers v. Earth Island Inst.,* 129 S. Ct. 1142 (2009). This is not a case where there is a procedural right *in vacuo*. Rather, the members' procedural interest in NEPA compliance is a legally protected interest, as are their concrete and particularized substantive recreational, aesthetic and financial interests. These legally protectable interests and the stated member injuries give rise to a live dispute in contrast to *Summers*, and are sufficient to create Article III standing.

In addition, the members' injuries are causally related to the 2009 CHD Rule and they are redressable by the relief requested. If the members receive a favorable decision, the 2009 CHD Rule would be invalidated, and the previous rule designating only 1,841 square miles of land would be reinstated. The LCAS standards identified by the Service as a primary causal factor relating to member injury may or may not be in effect or enforced as to some of the lands if they are released from the 2009 CHD Rule. "[T]he LCAS is designed to 'guide management on Federal lands across the range of lynx.' [Citation omitted] Thus, by definition, the LCAS only identifies and protects Lynx habitat on Federal lands, and does not protect its habitat on non-Federal land . . . ." *Defenders of Wildlife*, 239 F.Supp.2d at fn 13. Therefore, the LCAS standards do not apply to private land within the North Cascades as well as state and private land within the Greater Yellowstone Area, which are at issue in this

12

case. At a minimum, then, a favorable decision would ease regulatory burdens on state and private lands at issue herein, and fears would abate as to the Service's administration of the CHD. This is not a speculative result. *Friends of the Earth, Inc.*, 528 U.S. at 181 (the redressability prong is met when "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision"). For these reasons, the Court finds that the Associations have standing to assert their claims.

B.    NEPA

The Associations argue the massive CHD of 39,000 square miles of land triggered the requirement for the Service to conduct an Environmental Impact Statement (EIS) instead of an Environmental Assessment (EA). As to the EA, the Associations argue it fails to consider a range of alternatives, it fails to take a "hard look" at the reasonably foreseeable significant direct and indirect adverse effects of the designation, and it fails to adequately analyze the CHD's cumulative effects. As to the Finding of No Significant Impact (FONSI), the Associations argue it fails to overcome the presumption in favor of an EIS for habitat designations, and it is woefully inadequate.

1.    *Is an Environmental Assessment Allowed*

Without criticism, this Circuit recognizes the frequent federal agency practice "to conduct an Environmental Assessment (EA) before conducting the lengthy and expensive

13

investigation necessary to issue an EIS." *Middle Rio Grande Conservancy District v. Norton*, 294 F.3d 1220, 1224 (10th Cir. 2002). This practice is described as a "preliminary step to determine if the proposed action requires an EIS, i.e., whether the action is one that may significantly affect the quality of the human environment." *Id.* (citing 40 C.F.R. § 1501.4(b), (c)). An EA is defined as "a concise public document for which a Federal agency is responsible that serves to (1) briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* at § 1501.4 and § 1508.9. With the preparation of an EA, the agency makes either a finding of no significant impact (FONSI) and does not move on to an EIS, or the agency determines a significant environmental impact will result and prepares an EIS. *Id.;* 40 C.F.R. § 1501.4. If the EA results in a FONSI, the EA serves to complete the agency's obligations pursuant to NEPA. 40 C.F.R. § 1508.9(a)(2).

In this case, the Service took the preliminary step of conducting an EA, as is so frequently done by federal agencies. The Associations argue that this preliminary step was improper because of the "massive size" of the CHD under consideration. The size of the designation provides no basis to deprive the Service of preliminary procedures specifically allowed by law. Whenever an agency is uncertain whether an EIS is required, the agency may prepare a preliminary EA. 40 C.F.R. §§ 1501.4 and 1508.9. This Court cannot substitute

14

its judgment for that of the Service and decide that the Service should have been certain that an EIS was required. After all, "[t]he initial decision as to the necessity of an EIS is the agency's, not a reviewing court's." *Middle Rio Grande Conservancy District*, 294 F.3d at 1225-6. There is nothing arbitrary or capricious about the adherence by the Service to the authorized preliminary procedure of producing an EA in order to enable all involved to determine what the effect of the designation will be. What the Service finds based on the EA is another matter, which appears to be the crux of the dispute - namely that the Service made a finding of no significant impact rather than moving on to the preparation of a full-blown EIS.

2.    *Are the EA and FONSI inadequate under NEPA*

There is no dispute in this Circuit that NEPA applies to the designation of critical habitat under the ESA. *Catron County Bd. Of Comm'rs v. U.S. Fish and Wildlife Service*, 75 F.3d 1429, 1436 (10th Cir. 1996). NEPA requires federal agencies to consider the environmental impacts of their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council,* 462 U.S. 87, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). NEPA prescribes the process, not the end result, of agency action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). In this regard, the Tenth Circuit

15

has repeatedly emphasized that NEPA only requires an agency to take a "hard look" at environmental consequences of its actions and to adequately disclose those impacts to the public. *Baltimore Gas*, 462 U.S. at 97-98; *Middle Rio Grande Conservancy Dist.*, 294 F.3d at 1225.

### a. *Reasonable Range of Alternatives*

The Associations argue that in taking an "all or nothing approach" of either designating 42,000 square miles as critical habitat or taking the "no action" alternative, the EA failed to consider a reasonable range of alternatives. Under NEPA and its regulations, "government agencies must 'include in every recommendation or report on proposals' detailed statements analyzing 'alternatives to the proposed action.'" 42 U.S.C. § 4332(C)(iii). However, the agency has discretion to determine the alternatives to be studied. *Wyoming Lodging and Restaurant Assoc. v. U.S. Dept. Of the Interior*, 398 F.Supp.2d 1197, 1215 (D.Wyo.2005)(citations omitted). An agency need not include every possible alternative, nor analyze consequences of alternatives it has in good faith rejected "as too remote, speculative, or ... impractical or ineffective." *Id.* at 1215-16. Finally, in contrast with an EIS, an EA only requires brief discussions of the alternatives. 40 CFR § 1508.9(b).

The Associations' argument does not present a fair characterization of the EA or of the process employed. The EA identifies and discusses a "no action" alternative and the

preferred alternative of designating approximately 39,000 square miles. It also identifies and discusses additional alternatives that were considered but not fully evaluated. Therefore, the EA discussion of alternatives cannot be fairly characterized as an "all or nothing" approach.

Even more importantly, though, the consideration of reasonable alternatives under NEPA does not take place in a vacuum, but it is necessarily constrained by the mandates of the ESA. Stated otherwise - alternatives that are not legally permissible do not meet the purpose and need's criteria for detailed consideration in the EA. *Wyoming Lodging and Restaurant Assoc.*, 398 F.Supp.2d at 1217. For the Service to comply with the ESA, all reasonable alternatives must meet the statutory definition of "critical habitat" as discussed previously.

The considerations that framed the alternatives under review were described in the proposal to designate critical habitat. *See* 73 Fed.Reg.10860. The Service initially identified approximately 42,753 square miles of land that would fall within the boundaries of the proposed revised CHD, and requested comments in fourteen specific areas in order to refine the proposal to include more or less land. *Id.* Among other areas, the Service invited comments on whether tribal lands, or private lands, or lands in the Southern Rocky Mountains, or lands in the "Kettle Ranch", or Forest Service Lands in the "wildland-urban-interface," or the Greater Yellowstone Area should be included or excluded in the final

17

designation and why that might be so. The Service also sought specific information on areas

occupied by the lynx, as well as comments to assist in identifying or clarifying the primary

constituent element, and comments on land use designations and activities that could impact

the proposed revised designation. *Id.*

Following the comment period, the Service conducted a two-part analysis: "(1) We

relied on information used during listing of the species, and any available newer information,

to delineate the geographic area occupied by the species at the time of listing, and (2) used

the best available scientific information to determine which occupied areas contain the

physical and biological features essential to the conservation of the lynx." 74 Fed.Reg. 8640.

For lynx occupancy, the Service relied on recent verified records of lynx presence and

reproduction. For the "defined physical and biological features essential to the conservation

of the lynx," the Service considered those features laid out in the appropriate quantity and

spatial arrangement to be the Primary Constituent Elements (PCE) for the lynx. The Service

then determined that the single PCE for lynx is "boreal forest landscapes supporting a mosaic

of differing successional forest stages" which contain one or more of the following elements-

-(a) presence of snowshoe hares and their preferred habitat conditions, which include dense

understories of young trees or shrubs tall enough to protrude above the snow, and mature

multistoried stands with conifer boughs touching the snow surface; (b) winter snow

18

conditions that are generally deep and fluffy for extended periods of time; (c) sites for denning that have abundant coarse woody debris, such as downed trees and root wads; and (d) matrix habitat that does not provide habitat for snowshoe hares or lynx breeding sites, but is used by lynx as they travel between foraging areas and foraging and breeding areas. *Id.* Finally, as required by the ESA, the Service limited the consideration to lands that may require special management. 16 U.S.C. § 1532(5)(a)(II). The result of this analysis was the identification of "Alternative B" in the EA, which was the alternative to designate approximately 39,000 square miles of land. "Alternative A" in the EA was the "no action" alternative.

There is no dispute that the Service is required to consider reasonable alternatives that comply with the ESA. As noted above, the Service did not merely consider designating either 42,000 square miles of land or no land as argued by the Association, given that the ultimate decision was to designate approximately 39,000 square miles. While the Associations argue that the EA failed to consider the exclusions ultimately adopted by the Service, the record shows that the Service considered and discussed the benefits of each exclusion considered versus the benefits of inclusion. 73 Fed.Reg. 10860; 74 Fed.Reg. 8619, 8641, 8648-52, 8657-8658. Where an exclusion was granted, the record shows the Service decided that the benefits of exclusion outweighed the benefits of inclusion, and concluded

19

the exclusion would not result in the extinction of the species. *Id.* This process complies with both NEPA and the ESA given that the record includes a rational connection between comments requested by the Service, comments received, the facts found by the Service, and the choices it made to exclude certain lands. Other than the exclusions, the Associations do not identify other reasonable, feasible and ESA-compliant alternatives that the Service failed to consider. Therefore, the Court can find no error in the EA analysis of alternatives.

### b. *"Hard Look" at Adverse Effects*

The Associations argue that the EA failed to take a "hard look" at the reasonably foreseeable significant direct and indirect adverse effects of the designation. In particular, the Associations argue that the Service failed to discuss or analyze the impact of the designation on critical forest management and fire ecology practices, or the potential impacts on the Associations' recreational interests in terms of maintaining and creating snowmobile trails.

The crux of the Associations' argument is that the Service merely catalogued potential effects without analyzing them. It appears to this Court that the Service's analysis of impacts was driven in large part by the following two statements: (1) "Designation of critical habitat does not have any direct effects on the environment, except through the section 7 consultation process" and (2) "All impacts are expected to be indirect, as CHD does not in

20

itself directly result in any alteration of the environment." [AR C.629 & 630]. One issue then

is whether these conclusions are rational, adequately explained and consistent with the

evidence before the agency, or whether they are arbitrary, capricious, constitute a clear error

of judgment or are not in accordance with the law.

It is clear that the Tenth Circuit does not permit an assumption "that no actual impact

flows from the critical habitat designation." *Catron County Bd. of Comm'rs*, 75 F.3d at

1436. That is not what the Service has assumed, however. Further, the Service offers the

following explanation for its conclusions:

Designation of critical habitat does not have any direct effects on the environment, except through the section 7 consultation process. This is because critical habitat designation does not impose broad rules or restrictions on land use, nor does it automatically prohibit any land use activity. Each Federal action that could potentially affect designated critical habitat is analyzed individually during the section 7 consultation process. Individuals, organizations, local government, Tribes, States, and other non-Federal agencies are potentially affected by the designation of critical habitat only if their actions occur on Federal lands, require a Federal permit or license, or involve Federal funding (e.g., section 404 Clean Water Act permits from the U.S. Army Corps of Engineers or funding of activities by the Natural Resource Conservation Service).

Under section 7, Federal agencies are required to consult with the Service when their actions could affect critical habitat. For many listed species, critical habitat designation would not be expected to materially affect the number or nature of consultations. For instance, when critical habitat and the areas occupied by the species are equivalent, an action that would affect designated critical habitat also would affect the species and a consultation would be required regardless of critical habitat designation.

21

   In the case of the lynx, Federal actions that are likely to destroy or adversely modify critical habitat may also result in jeopardy to the species. Federal agencies have been required to ensure that their actions do not jeopardize the continued existence of the lynx since its listing in 2000. In practice, the outcome of section 7 consultation is often similar whether or not critical habitat is designated. Adverse effects on PCEs or portions of critical habitat generally would not result in an adverse modification determination unless that loss, when added to the environmental baseline, is likely to appreciably diminish the capability of the critical habitat designation to satisfy essential requirements of the species. In other words, activities that may destroy or adversely modify critical habitat include those that alter the PCE to an extent that the value of critical habitat for conservation of the species is appreciably reduced.

   Actions that would be expected to both jeopardize the continued existence of the lynx and destroy or adversely modify its critical habitat would include those that significantly and detrimentally alter its habitat over an area large enough that the likelihood of its survival and recovery is significantly reduced. Note that the scale of actions would be a crucial factor in determining whether they would directly or indirectly alter critical habitat to the extent that the value of the critical habitat for the survival and recovery of lynx would be appreciably diminished. Thus, the likelihood of an adverse modification or jeopardy determination would depend on the baseline condition of the species and the critical habitat.

[AR C.629-30]

  It is not the function of this Court "to decide what assumptions . . . we would make were we in the Secretary's position, but rather to scrutinize the record to ensure that the Secretary has ... provided a reasoned explanation for his policy assumptions . . .." *Wyoming Lodging and Restaurant Assoc.*, 398 F.Supp.2d at 1214 (citing *American Iron & Steel Institute v. Occupational Safety and Health Admin.*, 939 F.2d 975, 982 (D.C.Cir. 1991)). In

22

this case, the Service has provided a reasonable explanation for the assumptions used in formulating the 2009 CHD Rule. There is no question that designating an area as critical habitat has regulatory significance under section 7 of the ESA. Specifically, section 7(a)(2) requires all federal agencies to consult with the Service to ensure any actions they fund, authorize, or carry out will not "jeopardize" or "result in the destruction or adverse modification of" critical habitat.    16 U.S.C. § 1536(a)(2).  The Service must issue a biological opinion on the effects any federal agency action will have on the critical habitat, and it must provide reasonable and prudent alternatives to avoid any agency action resulting in the adverse modification of critical habitat.    50 C.F.R. § 402.14; 16 U.S.C. § 1536(b)(3)(A). However, as noted by the Service, consultation already occurs in many areas designated by the revised rule, because they are areas known to be occupied by the lynx.

Apart from section 7 consultations, a CHD also has non-regulatory effects by informing the public and private sectors of areas that are important for species recovery and where conservation actions or special management protections would be most effective. 74 Fed.Reg. 8647. However, the fear that broad regulatory rules and restrictions arise separate from section 7 consultations is unfounded, as is the fear that all persons conducting all activities on every parcel within the designation will be burdened by consultations and restrictions.

23

With this backdrop, the Service also proceeded to discuss timber-management related activities, fire management practices, and recreational activities. Within those discussions, the Service admits that under Alternative B (the 39,000 square mile designation), such activities and practices may be precluded or may require modification following re-initiation of section 7 consultations if there are potential effects on primary constituent elements or effects to the species. In addition, application of the "adverse modification standard" which applies to section 7 consultations is further discussed in the 2009 CHD Rule. The 2009 CHD Rule identifies a number of activities that may alter the physical and biological features on a scale proportional to the large landscapes used by the lynx, or that would divide lynx critical habitat. 74 Fed.Reg. 8644-8645. While the Associations do not like these potential adverse impacts to their interests, it is simply incorrect to argue that the impacts have been ignored, misrepresented or understated. The Service also correctly concludes, "[f]or projects where there is no Federal nexus, critical habitat designation does not impose rules or restrictions on land use so there would be no changes under the action Alternatives." [AR C.632].

"NEPA does not require particular results but rather a particular process." *Catron*, 75 F.3d at 1437 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989) and 40 C.F.R. 1500.1(c)). The process of taking

a "hard look" as required by NEPA was done and relevant information was disseminated to those potentially affected by the Service's decision.

### c. *Cumulative Effects*

In its last attack on the EA, the Associations argue that the EA failed to adequately analyze the CHD's cumulative effects. Before considering this issue, the Court must decide whether the issue is properly before it. The Service argues that the issue of cumulative impacts was not raised by the Associations at the agency level, and thus the Associations have forfeited their claim that cumulative effects were not properly analyzed. The Associations respond by arguing that the agency bears the primary responsibility to ensure compliance with NEPA and the Associations may raise the impact issue now provided another entity preserved it by way of comment.

In order to seek judicial relief of a NEPA issue, the Associations were required to first raise their concerns with the agency to allow "the agency to give the issue meaningful consideration." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553-54 (1978); *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004); *Forest Guardians v. FS*, 495 F.3d 1162, 1170 (10th Cir. 2007). The purpose of this rule is to ensure that reviewing courts do not substitute their "judgment for that of the agency on matters where the agency has not had an opportunity to make a factual record or apply its

expertise." *New Mexico Environmental Imp. Div. v. Thomas*, 789 F.2d 825, 835 (10th Cir.1986).

Notwithstanding these principles, the Associations correctly argue that this rule is not a strictly-construed jurisdictional prerequisite. For NEPA challenges, entities may challenge an issue they failed to address if someone else brought "sufficient attention to the issue to stimulate the agency's attention and consideration of the issue during the environmental analysis comment process." *Wyoming Lodging and Restaurant Assoc.*, 398 F.Supp.2d at 1210 citing *Benton County v. United States Dept. Of Energy*, 256 F.Supp.2d 1195-99 (E.D.Wash.2003).

The question then is whether the Service was alerted by someone else to the positions now asserted by the Associations. The Associations point the Court to the comment by the Valley County Board of Commissioners. That comment generally states that the designation has incremental cumulative effects which "are crippling Idaho counties,"and then focuses singularly on its concerns with the economic impact analysis. [AR A.006468-70]. The Associations also identify the comment from the Montana Logging Association, which discusses how CHD on state and private timberlands will affect the cumulative effects analysis when the Service and the BLM develops site specific environmental analysis, which will lead to "yet another impediment to active resource management." [AR A.000302].

26

These two references to general comments do not support the claim that someone else brought sufficient attention to the issue that the Associations now desire to raise in court - namely that the EA fails to specify what types of effects might result from reinitiated or new consultations, and that there may be minor effects which could collectively become significant when properly analyzed. *See Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C.Cir.2001)("Generalized objections to agency action ... will not do. An objection must be made with sufficient specificity to alert the agency.") Indeed, even by their briefs the Associations fail to identify what specific cumulative impacts have not been analyzed. Given this, the Court concludes the Associations have waived any challenge to the cumulative impact analysis.

d.    *Adequacy of the FONSI*

Focusing on the FONSI, the Associations argue the FONSI failed to overcome the EIS presumption applicable to the lynx designation, and did not articulate any explanation for the Service's perfunctory conclusion that the effects of the lynx designation would not be significant.

As discussed previously, this Court does not read the Tenth Circuit law to create an "EIS presumption" for CHDs. The law is clear that the Service must comply with NEPA and, "[w]hen the environmental ramifications of such designations are unknown, we believe

27

Congress intends that the Secretary prepare an EA leading to either a FONSI or an EIS."

*Catron*, 75 F.3d at 1439. An EIS is only required for "major Federal action[s] significantly affecting the quality of the human environment." 42 U.S.C. § 4332. CHDs are not different federal actions in some respect for purposes of the imposition of any EIS presumption.

In considering the FONSI, the explanation for the Service's conclusion on the effects of the designation of critical habitat is the information contained in the EA, including information such as the Economic Analysis, which was incorporated by the EA. Within the language of the FONSI, the Service explained that it considered the potential economic cost resulting from the 2009 CHD Rule. [AR C.544-45]. The Service also explained that it evaluated the benefits of conservation programs, plans, and partnerships relative to the regulatory benefits of critical habitat. *Id.* Finally, the Service explained: (1) there is added protection provided under ESA section 7 for designated critical habitat, but only on Federal lands and non-Federal lands where the proposed activities involve a Federal nexus; (2) the designation of critical habitat does not affect land ownership or establish a refuge, wilderness, reserve, preserve or other conservation area; and (3) except for the added protection noted in (1), the critical habitat designation does not otherwise result in any regulatory requirements. *Id.* Therefore, as the Service correctly notes, the CHD does not set aside a land area greater than the state of Indiana solely, or even primarily, for the

28

conservation of lynx. There is no "set aside" at all, and no regulatory requirements necessarily follow except for ESA section 7 consultation for Federal lands and non-federal lands where there is a Federal nexus.

Finally, the record is replete with discussions that these effects are largely connected with measures designed for the conservation of the lynx as a threatened species, and do not arise singularly from the CHD. [AR C.629-30]; 74 Fed.Reg. 8629, 8633, 8644. On this point, the Court will not substitute its judgment for that of the Service's and conclude the 2009 CHD Rule is a "major federal action" under NEPA. *See also, Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 83 (D.C.Cir. 1997).

While the FONSI certainly does not offer a lengthy explanation for its "no significant impact" conclusion, considering the record as a whole, it suffices as an adequate explanation for the Service's finding. And while the economic impact analysis has been found deficient under the ESA as noted below, this does not make the FONSI analysis deficient under NEPA, nor does it automatically convert the 2009 CHD Rule to a major Federal action significantly affecting the quality of the human environment requiring the preparation of a full-blown EIS.

C.    Critical Habitat Designation Under ESA Section 4

The Associations argue the 2009 CHD Rule violates Section 4 of the Endangered

29

Species Act because lands were designated which lacked "primary constituent elements"

(PCEs) necessary for the conservation of the lynx, and lands were designated which do not

require special management considerations or protection. The two land areas under dispute

are the Greater Yellowstone Area (GYA) and the Washington State Lands Recently

Destroyed by Forest Fires (Burned-Out Lands).

1.    *Waiver*

As to the GYA issue, the Service again argues waiver by pointing out that the

comments and the ESA citizen suit notice filed by the Washington State Snowmobile

Association did not voice any issue with the proposed CHD affecting the GYA, and the

Wyoming Association did not submit any comments whatsoever on the 2009 CHD Rule, nor

did it submit a notice under the citizen suit provision. The Associations' response is that the

challenge relating to the GYA lands is only under the Administrative Procedure Act, and not

pursuant to its citizen suit notice under the ESA.

This appears to the Court to be a distinction without a difference. Under the APA, a

party who does not contest the rationality of an underlying decision or issue during the public

comment period, cannot raise the issue on appeal using the APA judicial review provision.

*Arizona Pubic Service Co. v. U.S.E.P.A.*, 562 F.3d 1116, 1127 (10th Cir. 2009)(citations

omitted). Also, the fact that others may have raised concerns with the proposed designation

of GYA lands does not avoid the undisputed fact that these petitioners did not. Finally, other commenters did not raise the issues the Associations now wish the Court to consider - specifically, (1) the GYA does not contain PCEs, (2) the Service's reversal of position on the GYA is not sufficiently explained, and (3) the GYA does not require special management considerations or protection. The closest comment[2] on point comes from the Wyoming State Forestry Division, which asked the Service to reconsider its definition of the term "boreal forest." [AR A.1032-1034] This comment is not sufficiently similar to the issues now sought to be raised by the Associations. Further, the comment from Wyoming State Forestry Division emphasizes the need for "continued active forest management," rather than suggesting the GYA doesn't require special management considerations or protection. *Id.*

The Associations also do not refer the Court to any ESA or APA case that excuses them from these well-recognized procedural prerequisites to suit. Therefore, the Associations' arguments that the GYA does not contain PCEs, that the Service's reversal of position on the GYA is not sufficiently explained, and that the GYA does not require special

---

[2]The Wyoming Department of Agriculture submitted comments asking the Service to recognize that forests are currently managed for multiple-use and for multiple species, which would be adversely affected by the proposed 2009 CHD Rule. [AR A.1027-29] The agency also asked the Service to allow State wildlife agencies to manage lynx. *Id.* This comment does not raise the issues now sought to be raised by the Associations. The final comment referenced by the Associations did not concern the proposed 2009 CHD Rule, but was a comment on the proposed 2006 CHD Rule. [AR A.6465-66]

management or protection, are waived because the record does not show presentation of these specific issues to the Service as required by the ESA and the APA.

### 2. *Do the Burned-Out Lands Contain PCEs*

The Washington State Snowmobile Association argues that the defined features (boreal forest landscapes) were destroyed on the Burned-Out Lands by a series of stand-replacing wildfires, and the Service cannot designate lands that "might someday acquire PCEs" as opposed to currently having PCEs at the time of designation. The Association also argues that "matrix habitat" as an element of the landscape must occur between patches of boreal forest "in close juxtaposition" such that lynx are likely to travel through such habitat while accessing patches of boreal forest within a home range. The Burned-Out Lands, according to the Association, are not in "close juxtaposition" to patches of boreal forest to qualify as critical habitat.

The Service responds that the Burned-Out Lands still contain the single, albeit compound, PCE as a "boreal forest landscape supporting a mosaic of differing successional forest stages." The Service argues that the fires have merely converted the boreal forest from a later successional stage back to a beginning stage - "matrix habitat" - as a physical or biological feature essential to the conservation of the lynx. "Matrix habitat" provides "habitat connectivity for travel within home ranges, exploratory movements, and dispersal

32

within critical habitat units." 74 Fed.Reg. 8638. The Service further states that the science for the designation was adequately explained in the record. *See* 74 Fed.Reg. 8616-17, 8623-24, 8634-38, 8643. Finally, the Service responds that the Burned-Out Lands have verified records of long-term lynx occupation and reproduction, a conclusion unchallenged by the Association. Therefore, the Service contends these lands meet the criteria for designation as critical habitat based on current conditions, not because of any "hoped-for" conditions.

The Service's argument that these Burned-Out Lands constitute a boreal forest in a different successional phase which is consistently used by verified current, reproducing populations of lynx is persuasive and supports the CHD. The Washington State Snowmobile Association's argument would have been more persuasive had there been any dispute over whether the lynx currently occupies and uses these Burned-Out Lands. There is no dispute on that point. Rather, these areas are verifiably occupied by the lynx, where breeding and consistent, long-term use is also documented.[3] *74 Fed.Reg. 8643.* The record supports the conclusion that evidence of breeding provides evidence that habitat contains the necessary elements for lynx conservation. *See*, 74 Fed.Reg. 8635-37 & 40-42; *Alliance for the Wild Rockies v. Lyder*, 2101 WL 3023652 (D.Mont).

---

[3]The process for documentation of lynx occupation and reproduction is particularly stringent. 74 Fed.Reg. 8640-41.

Further, one cannot immediately reject the Burned-Out Lands simply because these areas do not contain each condition or feature of the boreal forest. This argument confuses the single PCE with its compound parts. As noted above, the Service identified a single PCE for lynx: "boreal forest landscapes supporting a mosaic of differing successional forest stages." The Service then describes, by compound parts, what the landscapes must contain - snowshoe hares for prey, certain snow conditions, woody debris piles for denning, and matrix habitat. Any particular part of a forest (as opposed to the larger forest landscape) need not (and will not) contain every compound part because it is the **landscape as a whole**, which includes boreal forest areas in different successional stages due to fire, disease, etc., that contains the PCE essential to the conservation of the lynx.

Further, the importance of matrix habitat on a landscape scale cannot be ignored. The "close juxtaposition" of the boreal forest used for denning and foraging compared to the matrix habitat (here, the Burned-Out Lands) must be understood within the context of the landscape-scale use of the habitat by the lynx. 74 Fed.Reg. 8638. In this context, "[i]ndividual lynx require large portions of boreal forest landscapes to support their home ranges and to facilitate dispersal and exploratory travel." 74 Fed.Reg. 8636. Individual lynx maintain large home ranges - reported as generally ranging between 12 to 83 square miles. *Id.* at 8616. Lynx generally move long distances - greater than 60 miles - for dispersal to

34

establish new home ranges or as exploratory movements outside their home ranges. *Id.*

Thus, one cannot immediately reject the proposition that matrix habitat could include areas the size of the Burned-Out Lands. Areas identified as having features essential to the conservation of the lynx are large enough to encompass multiple home ranges, and also must include additional land for dispersion and exploratory travel. 74 Fed.Reg. 8616; 8640. One also cannot conclude that these lands require no "special management or protection" as argued by the Washington State Snowmobile Association. The record is clear that matrix habitat must be managed, at a minimum, to maintain "the ability for lynx to move through this habitat to access other habitat types within a home range." 74 Fed.Reg. 8620.

Finally, this Court is unwilling to second-guess the Service on its decision that the forest fires did not remove the PCE, but merely moved the boreal forest into a different successional stage. This type of decision involves "technical or scientific matters within the agency's area of expertise" and is entitled to standard deference afforded such agency determinations.[4] *Utah Envtl. Cong.*, 443 F.3d at 739. Therefore, the Service's 2009 CHD Rule concerning the Burned-Out Lands is adequately supported by the undisputed, current, breeding population of lynx using these areas, and the record which shows that individual

---

[4]The Service has found that "natural fire plays an important role in creating the mosaic of vegetation patterns, forest stand ages, and structure that provide good lynx and showshoe hare habitat." 74 Fed.Reg. 8619.

lynx typically use a larger forest landscape which includes matrix (non-forest) habitat, and

that the lynx relies on matrix habitat as part of, and to link together its home range, as well

as to facilitate dispersal and exploratory travel.

3.     *Special Management Considerations or Protection*

The Associations also argue the Service erred in designating federal lands in

Washington and Wyoming[5] which do not require special management considerations or

protection because they are adequately protected under the LCAS. The Associations point

out that the 2006 CHD Rule did not include lands subject to the LCAS, finding that the

LCAS is a plan or agreement which addresses the maintenance and improvement of the PCEs

for the lynx that is at least equivalent to that provided by a CHD and it is expected to

continue into the foreseeable future and be effective. *See* 71 Fed.Reg. 66010-11, 66033-34,

66036. Because the 2009 CHD Rule is just the opposite of the 2006 CHD Rule on this point,

the Associations argue that the Service has "flip-flopped" by its decision to now designate

federal lands managed under the LCAS as critical habitat, and that such a radical reversal of

position is not adequately supported or explained in the record and the decision is contrary

_____

[5]The Court does not consider the GYA lands because the Associations waived
their argument relating to these lands by failing to raise the issue in the first instance with
the agency, and also by failing to include this issue in the notice of citizen suit under the
ESA. *See supra* at C.1.

to the statute requiring a determination that "special" management considerations or protection are required. As to the "radical reversal," the Associations argue that the Service must not just explain the change, but it must clearly articulate the basis for the change and show a purpose for the change within the agency's authority. *See Dimension Financial Corp. v. Board of Governors of the Fed. Reserve Sys.*, 744 F.2d 1402, 1409-10 (10th Cir. 1984).

In response, the Service argues that the decision is adequately supported by the finding that "essential features on land covered by management programs or plans that have been revised or amended to adopt the LCAS do require special management or protection, and therefore meet the definition of critical habitat in Section 3(b)(A) of the Act." 74 Fed.Reg. 8624. Essentially, the Service is making the point that the ESA requires a determination that the physical or biological features may require special management or protection, not the land itself, and thus the Associations, by their argument, are misreading this provision of the ESA. Finally, the Service distinguishes *Dimension Financial Corp.* on the basis that the 2006 CHD Rule was not legally defensible, thus the Service was not required to provide any more detailed explanation for the change than provided by the record. *FCC v. Fox Television Stations, Inc.*, 129 S.Ct. 1800, 1810-11 (2009).

The Court is persuaded by the Service's argument. Merely because certain land units are managed under LCAS, that is not determinative on whether or not the habitat at issue is

37

"critical" to the lynx. It also does not necessarily mean the essential features themselves (i.e., boreal forest landscapes containing certain elements) don't require special management or protection. *See Arizona Cattle Growers Ass'n v. Kempthorne*, 534 F.Supp.2d 1013, 1031 (D.Ariz.2008)("the statute does not require anything more than a finding that the physical and biological features *themselves*, not the 52 habitat units, may require special management").

Here, the record indicates that research continues on lynx habitat, contributing to new information since the LCAS was written, including information on the importance of multi-storied stands which may result in a preservation standard not contained in LCAS. 74 Fed.Reg. 8625 & 8639. If there are existing or new methods or procedures which may be considered useful in protecting the essential features *themselves* for the conservation of the species (as opposed to the land units), whether those methods or procedures are in the LCAS or not, then the "special management considerations and protection" prong of the critical habitat test is satisfied. *See* 50 CFR § 424.02(j). This is a "relatively minor legal hurdle" which has been overcome by the record in this case. *Arizona Cattle Growers Ass'n, 534 F.Supp.2d* at 1031.

Further, even though an agency changing its course is obligated to supply a reasoned analysis for the change beyond what may be required when first taking action, "an agency

must be given ample latitude 'to adapt their rules and policies to the demands of changing circumstances.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm*, 463 U.S. 29, 42 103 S.Ct. 2856, 2866 (1983) citing *Permian Basin Area Rate Cases*, 390 U.S. 747, 784, 88 S.Ct. 1344, 1368-1369, 20 L.Ed.2d 312 (1968). The revisions embodied by the 2009 CHD Rule derived from the Service's conclusion that the 2006 CHD Rule was tainted by MacDonald's improper influence and lacked support by law or science. 74 Fed.Reg. 8617-18. In addition, the Service faced the Mexican Spotted Owl decision, which undermined its past practice of using management plans to assert that areas do not meet the definition of critical habitat because they do not require special management or protection. *Center for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1099 (D.Ariz.2003)(rejected as "nonsensical" the Service's prior interpretation of "critical habitat" which automatically excluded areas if adequate management or protections were already in place). [AR I.5845] These "changed circumstances" support affording the Service ample latitude to revise the 2006 CHD Rule without saddling it with a heightened burden to show more of a basis and purpose for its revisions than what is contained in the record.

D.     Economic Impact Analysis

       The Associations argue the Service's economic analysis is inadequate in considering the resulting costs to the Associations and their members, and it is contrary to Tenth Circuit

precedent. The Service responds that it used a reasoned approach that is not inconsistent with Tenth Circuit precedent and therefore, its economic analysis should be upheld.

The issue of proper economic analysis in the Tenth Circuit stems from the dual process of listing an endangered species, then determining the CHD. The ESA grants the Secretary of the Interior, through the Service, the authority to list those species in need of protection as either endangered or threatened. The determination of whether a species is listed is based in part on the "the present or threatened destruction, modification, or curtailment of its habitat or range." 16 U.S.C. § 1533(a)(1). This determination is "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Therefore, economic analysis is not a consideration when determining whether to list a species as endangered or threatened.

Listing alone results in certain protections for the species, including a requirement that all federal agencies must consult the Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). In addition to other protections provided to listed species, the Service is also required to designate "critical habitat" for all species, if determinable. However, in designating critical habitat the ESA requires the Service to "perform an economic analysis of the effects of the CHD before making a final

designation." *New Mexico Cattle Ass'n*, 248 F.3d at 1280 (citing 16 U.S.C. §1533(b)(2)). The Secretary has discretion to exclude any area from the designation if it determines that "the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat,...." 16 U.S.C. § 1533(b)(2). Once a critical habitat is designated, federal agencies must consult with the Service to "insure that any action authorized, funded, or carried out by such agency...is not likely to...result in the destruction or adverse modification of [designated critical] habitat." *New Mexico Cattle Ass'n,* 248 F.3d at 1283)(citing 16 U.S.C. §1533(a)(2)). "Thus, agency action that is prohibited is both (1) action that is likely to jeopardize the existence of a listed species and (2) action that is likely to result in the adverse modification of any area within a CHD." *New Mexico Cattle Ass'n,* 248 F.3d at 1283

The Tenth Circuit in *New Mexico Cattle Growers Ass'n* sought to determine the meaning of "economic impact" in 16 U. S. C. § 1533(b)(2) and what was required for an economic analysis in making a CHD. *Id.* At the time of the decision, this question was of first impression. *Id.* Prior to the Tenth Circuit's decision in *New Mexico Cattle Ass'n*, the Service had adopted a "baseline" approach to determine the "economic impact" of a CHD. This approach was premised on the idea that listing of a species carries economic impacts, which would occur regardless of the determination of the CHD. Therefore, this approach moved any economic impact which is attributable to the listing below the baseline and only

considered incremental economic impacts of designating the CHD in the economic analysis. Therefore, impacts attributable to other factors, such as the initial listing, were not considered an "economic impact" of designating an area as critical habitat.

In *New Mexico Cattle Growers Ass'n*, the Court considered whether the Service was required to analyze all the economic impacts of the CHD, or only those that were a "but for" result of the CHD. The Court determined that it was clear that economic factors had no part in the process when the listing determination was being made. However, the Court found that "Congress clearly intended that economic factors were to be considered in connection with the CHD." *Id.* at 1285 (citing 16 U.S.C. § 1533(b)(2)). The Court determined that because regulations setting the jeopardy standard for listing fully encompassed the adverse modification standard for designated areas, any economic analysis done utilizing the baseline approach would be virtually meaningless. *New Mexico Cattle Ass'n,* 248 F.3d at 1285. The Court went on to state: "We are compelled by the canons of statutory interpretation to give some effect to the congressional directive that economic impacts be considered at the time of critical habitat designation." *Id.* The Court concluded that "Congress intended that the Service conduct a full analysis of all the economic impacts of a CHD regardless of whether those impacts are attributable co-extensively to other causes. Thus, we hold the baseline approach to economic analysis is not in accord with the language or intent of the ESA." *Id.*

42

In reviewing the Final Economic Analysis, the Service identified the split in case law regarding the use of the baseline approach compared to a full economic analysis. [AR C.706-07]. In attempting to comply with Tenth Circuit law, which requires a full economic analysis, and the law from other jurisdictions allowing the Service to consider only the incremental impacts of the CHD, the Economic Analysis reports both the baseline impacts and the estimated incremental impacts. *Id.* The baseline impacts are defined as those impacts which would occur even in the absence of the designation. The incremental impacts are those "impacts on land uses and actives from the designation that are above and beyond these impacts due to existing required or voluntary conservation efforts." [AR. C.712].

In its key findings, the Service determined that the total baseline impacts of conservation efforts for the Canadian Lynx for the study area were between $123 million and $135 million. The Service also discussed the baseline and incremental impacts for all activities by subunit. [AR C.681-83]. The Service discussed the impacts on recreation, including the potential impacts of lynx conservation on snowmobiling, ski area development projects, and trapping activities. [AR C.802]. The Service found that the anticipated impact on these areas was expected to be baseline, essentially that lynx conservation management activities has been developed based on the species listing and therefore were not expected to change with the designation. *Id.*

43

With this backdrop, the Court concludes that the Service *conducted* a full analysis of all of the economic impacts of the CHD, regardless of whether those impacts were attributable co-extensively to other causes. This part of the economic analysis is consistent with Tenth Circuit precedent. However, it is unclear and indeed highly questionable that the Service *considered* the full analysis of all the economic impacts. Only the "quantifiable discounted future **incremental** costs" of the CHD are even mentioned in the 2009 CHD Rule. 74 Fed.Reg. 8658 (emphasis added); *see also, Id.* at 8628. These incremental costs represent only those impacts that are a "but for" result of the CHD. This is contrary to Tenth Circuit precedent which not only requires the Service to conduct a full analysis of all the economic impacts, but also to consider those economic impacts in order to give effect to the explicit directive from Congress that the CHD be based on the best scientific data available considering "the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." 16 U.S.C. § 1533(b)(2); *New Mexico Cattle Ass'n*, 248 F.3d at 1285. As the Solicitor explains, "Congress wanted the Secretary to understand the costs on human activity of making a designation before he made a decision and thereby provide an opportunity to minimize potential future conflicts between species conservation and other relevant priorities at an early opportunity." [AR C.1019-20]. Further, to "consider" means to investigate, analyze and ultimately to "give careful thought to the relevant information in

the context of deciding whether or not to proceed with the optional exclusion analysis." [*Id.* at 1031].

Here, the record indicates that the Service performed the full analysis of economic impacts and then failed or refused to give it any careful thought. This ignores the explicit congressional directive and it ignores Tenth Circuit law which has determined that the full economic analysis is relevant information. Therefore, in its consideration of the economic impacts of the CHD, the Service failed to follow procedures required by law.

E.    Exclusion Under ESA Section 4(b)(2)

The Washington State Snowmobile Association argues the Service erred in failing to determine under ESA Section 4(b)(2) whether to exclude certain U.S. Forest Service lands in Washington State currently managed by the LCAS, notwithstanding extensive comments on the economic effects of the proposed designation on small business reliant on the snowmobiling industry in the Okahogan and Wenatchee National Forests. [AR A.000799-823]. The Service responds by arguing the decision is committed to agency discretion and is not reviewable and, if it is subject to judicial review, the Service adequately stated its reasons for not excluding any federal lands from CHD under Section 4(b)(2).

This Court agrees that the Secretary has broad discretion under Section 4(b)(2) regarding which factors to use and how much weight to give to any factor. However,

45

questions of broad agency discretion and standards for meaningful judicial review do not apply to issues concerning whether the Secretary acted in a manner that was not in accordance with law or without observance of procedure required by law under 5 U.S.C. § 706(2)(A). These issues are open to judicial review absent congressional direction to the contrary. These are the limited issues this Court will address in this subpart making it unnecessary to rule on whether Section 4(b)(2) decisions made in accordance with law are reviewable.

The Service's economic impact analysis discussed above "is intended to assist the Secretary in making decisions about whether the benefits of excluding particular areas from the designation outweigh the benefits of including those areas in the designation" under Section 4(b)(2) of the ESA. 74 Fed.Reg. 8658. The economic analysis can also be used by the Secretary to assess whether the effects of the designation might unduly burden a particular group or economic sector. *Id.*

In the 2009 CHD Rule, the Secretary decided not to exclude any lands from critical habitat based on economic impacts. *Id.* This decision derives from an economic impact analysis in which the Service failed to comply with the intent of Congress which requires it to consider the full analysis of all the economic impacts. Therefore, the Secretary's exclusion decision as to the U.S. Forest Service lands in Washington currently managed by the LCAS

46

is not in accordance with the ESA and it does not comply with the procedures required by law.

## V. Remedy

Upon finding the 2009 CHD Rule unlawful because of the Service's failure to consider the full analysis of all economic impacts, it is important to consider the remedy. Given that the Service conducted a full economic impact analysis and further given that the economic impact analysis is primarily designed and intended to assist the Secretary as to exclusion requests, it does not seem appropriate to enjoin the 2009 CHD Rule's implementation on a nationwide basis, or to let the prior rule be reinstated given its tainted history. However, the Washington State Snowmobile Association did properly preserve the issue of inadequate consideration of economic effects in the context of its particular exclusion request, which appears sufficient to warrant relief as to these specific federal forest service lands currently managed by the LCAS.

In addition, limited relief in the context of the exclusion request would not appear to endanger the lynx pending proper and full consideration of economic impacts as required under the ESA. Even though research is still ongoing, the Service admits that "[t]he LCAS constitutes the best available information on conserving lynx." 74 Fed.Reg. 8624. As of February 25, 2009, the Service and the U.S. Forest Service were signatories to an agreement

47

protecting lynx on national forest lands until all Land Resource Management Plans (LRMP) could be amended consistent with the direction in LCAS. *Id.* Also as of that date, the Okahogan-Wenatchee National Forest in Unit 4 (the North Cascades) was in the process of amending its LRMP. *Id.* Therefore, the lynx should remain adequately protected by virtue of its listing and by continued implementation of the LCAS pending proper consideration by the Secretary of the full analysis of all economic impacts in the context of the Washington Association's specific request for exclusion under ESA Section 4(b)(2).

## VI. Conclusion

As set forth above, the Service failed to consider the full analysis of all the economic impacts, which undermined the Secretary's exclusion decision under Section 4(b)(2) of the ESA. The 2009 final Canada lynx CHD Rule is thus enjoined, but only as to those certain U.S. Forest Service lands in Washington State (Unit 4) that are currently managed by the LCAS, pending review and consideration by the Secretary of the full analysis of all the economic impacts, and a determination on the exclusion request of the Washington State Snowmobile Association as to those specific lands, consistent with this opinion and the ESA.

Dated this 10th day of September, 2010.

NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE